IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:11CR556 |
| | ) | |
| RANCES ULICES AMAYA, | ) | Hon. Anthony J. Trenga |
|    a.k.a. "Murder" | ) | |
|    a.k.a. "Blue," | ) | Sentencing: June 1, 2012 |
|                   Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

In accord with 18 U.S.C. §3553(a), the United States Sentencing Guidelines Manual ("Guidelines") §6A1.2, the United States of America, by and through undersigned counsel, submits the following Position with Respect to Sentencing of RANCES ULICES AMAYA ("Defendant"), also known as "Murder" and "Blue." The Guidelines are properly calculated and provide an advisory Guidelines range of 360 months to life imprisonment. A sentence of life imprisonment is absolutely necessary to address the sentencing factors and goals set forth in Title 18, U.S.C. §3553.

**I. Applicable Sentencing Law**

Even though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 125 S. Ct. 738, 767 (2005). "[A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the Guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the Guidelines and

those factors set forth in [18 U.S.C.] §3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553 states that the court should consider the nature and circumstances of the offense and characteristics of the defendant. In addition, it states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B).

The sentence imposed must meet a standard of reasonableness, *see Booker*, 125 S. Ct. at 765, and as the Fourth Circuit has stated, "reasonableness is not measured simply by whether the sentence falls within the statutory range, but by whether the sentence was guided by the Sentencing Guidelines and by the provisions of § 3553(a)." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). As explained in *Gall v. United States*, 552 U.S. 38, 49-50 (2007), a district court's sentencing duties are as follows:

> As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.[] In so doing, he may not presume that the Guidelines range is reasonable. See [*Rita v. United States*]*,* 551 U.S. 338, 2007. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. *Id.,* at 338.

## II. Sentencing Guidelines & 3553 Factors

### A. Guideline Calculations

The United States has reviewed the presentence report prepared in this matter and does not dispute any of the facts or calculations set out therein.

####    i.    Base Offense Level: Sex Trafficking of Children (30)

Pursuant to Guidelines section 2G1.3(a)(2), Defendant's base offense level for his crime of sex trafficking of children is a level 30. As stated in Worksheet A of the Presentence Report, Guidelines section 2G1.3(a)(2) is applicable to a defendant who violates Title 18, U.S.C. §1591(a)(1). Section 1591(a)(1) is not specifically listed within Guidelines section 2G1.3 because the penalty provisions for §1591(a)(1), which are most relevant to sentencing, are found in §1591(b). Here, Defendant was convicted of violating §1591(a)(1) and his conduct was encompassed by §1591(b)(2) because his victims were fourteen years of age, or older, as contemplated by that subsection. Consequently, §1591(b)(2)'s base offense level of 30 is applicable and appropriate.

####    ii.    Two Point Enhancement: Unduly Influenced a Minor (32)

The probation officer correctly assessed the two-point enhancement, pursuant to 2G1.3(b)(2)(B), for undue influence of a minor. Application Note 3 to §2G1.3 states that undue influence occurs where Defendant's influence compromises the voluntariness of the minor's behavior. The record supports that Defendant supplied the three juvenile victims with drugs and alcohol in an effort to influence them to participate in his prostitution scheme. This conduct falls squarely within "compromising the voluntariness of" a minor victim's behavior. Further, as adduced through witness testimony at trial, Defendant raped Jane Doe 1 and Jane Doe 3, and struck Jane Doe 2 in the face, all during the life of the juvenile sex trafficking conspiracy. Defendant's sexual and

physical assault of these three victims also compromised the voluntariness of the minor victims' behavior and eroded away any independence they might have had prior to being exploited as prostitutes. Therefore, the probation officer correctly assessed the two point enhancement for undue influence on all counts. This two point enhancement results in an offense level of 32.

### iii.   Two Point Enhancement: Offense Involved Sexual Act (34)

As the evidence adduced at trial made clear, Defendant prostituted juvenile females; specifically, he obtained money in exchange for the juvenile females having sexual intercourse with paying customers. These acts of sexual intercourse, which were integral to the prostitution scheme, meet the definition of a sexual act contemplated by Guidelines §2G1.3(b)(4)(A). Section 2G1.3(b)(4)(A), through cross reference to 18 U.S.C. §2246(2), defines sexual act as contact between "the penis and the vulva." There is no question that this type of sexual act occurred during, and throughout, this offense. With the imposition of this second two-point enhancement, Defendant's offense level rises to a level 34.

### iv.   Three Point Enhancement: Multiple Juvenile Sex Trafficking Victims (37)

Guidelines section 2G1.3(d) instructs that if there is more than one minor victim involved in the offense conduct, each victim should be treated as a separate count of conviction. As the jury unanimously found beyond a reasonable doubt, Defendant's scheme involved three distinct juvenile victims. Consequently, Defendant receives a three-point enhancement, under §3D1.4, for closely related counts. With this enhancement, Defendant has an adjusted offense level of 37.

//

### v. Five Point Enhancement for Repeat & Dangerous Sex Offender (42)

The Guidelines next contemplate a five-point enhancement for certain sex crimes where the defendant committed those crimes on a least two separate occasions. *Guidelines* §4B1.5(b)(1) and accompanying application notes. The application notes following §4B1.5(b)(1), specifically identify violations of §1591 as a "covered sex crime." This repeat and dangerous sex offender enhancement applies here because Defendant engaged in sex trafficking over a period of days and prostituted the victims on numerous occasions. This enhancement leaves Defendant with an adjusted base offense level of 42.

### vi. Defendant's Criminal History (VI)

Defendant, as will be more fully addressed during analysis of the §3553(a) factors, has an egregious criminal record that began at age 13 and ran continuously up through the commission of his present offenses. Defendant's prior convictions include violent assaults, sexually deviant behavior, theft, and illegal street gang activity. Through his twelve previous convictions, amassed in just over nine years, Defendant has accumulated 13 criminal history points; the maximum contemplated by the Guidelines. In addition, Defendant was assessed two additional criminal history points because he was on probation when he committed the current offense. Defendant, therefore, has 15 criminal history points, which places him in criminal history category VI, which is the highest category possible.

Defendant's adjusted offense level of 42, when combined with his criminal history category VI, yields a proper advisory Guidelines range of 360 months to life imprisonment.

//

### B. 18 U.S.C. § 3553(a) Factors

### i. Life Imprisonment is Reasonable, Appropriate, Necessary, and Just, Given the Nature and Circumstances of the Offense

On February 12, 2012, a jury unanimously found that Defendant not only committed the despicable act of sex trafficking of girls, but that he did so multiple times and for a prolonged period of time. Specifically, the jury adjudged Defendant guilty of one count of conspiracy to commit sex trafficking of children and three substantive counts of sex trafficking different juvenile females, one of which was only fourteen at the time Defendant prostituted her.

As the evidence at trial made clear, Defendant conspired as well as aided and abetted others in the sex trafficking of juvenile females. This juvenile prostitution scheme, perpetrated by members and associates of the extremely violent, transnational street gang, Mara Salvatrucha Thirteen ("MS-13"), was sickeningly simple. Defendant and others preyed upon young, vulnerable girls. Defendant provided these girls with drugs and alcohol, raped at least two of them, and then ordered the juvenile victims to prostitute themselves. Defendant also obtained prostitution clients who paid for fifteen minutes of sex with the minors. The acts of prostitution would take place in cars, hotels, apartments, and businesses. Defendant, along with others, would repeat this scenario up to 10 times per day with each juvenile victim, and Defendant would pocket a large portion of the prostitution earnings for himself.

The juvenile victims were recruited from Northern Virginia middle and high schools as well as from homeless shelters. The girls, some of whom were particularly vulnerable runaways, needed friends, support, and a place to stay. Defendant preyed upon this need and exploited the girls' vulnerabilities.

Defendant actively participated in the prostitution scheme in a number of ways.  First, Defendant provided the following critical supplies to ensure the success of the juvenile prostitution racket: paying clients, condoms, the morning after pill, [lest one of the victims miss work] alcohol, drugs, [to sedate the girls and keep them compliant] and hotel rooms [where the sex acts took place].  Regarding the recruitment of clients, Defendant utilized his established network of MS-13 "homies" to recruit men to have sex with the juvenile victims for money.  Second, Defendant was the "intimidator" or "muscle" for the business.  At the time of the prostitution scheme, Defendant was a respected MS-13 leader, or "shot caller," who had a reputation for violence.  He used his position within the gang, as well as his volatile demeanor, to keep both the juvenile victims and clients in line.  He made statements to the victims that he "owned them" and that he would hurt their loved ones if they stepped out of line or did not obey his orders.  His reputation and demeanor ensured that clients paid and the juvenile victims remained prostitutes, both of which were critical to maintaining the prostitution scheme.  Third, Defendant managed the business when others were busy.  He would stay with the victims in the hotels at night and make sure they were ready for their prostitution appointments the next day and did not flee.   Finally, Defendant also rode in the vehicles during client recruitment and transportation of the  juvenile victims to prostitution appointments to provide "security" lest a victim tried to escape or a customer failed to pay.  A lucrative prostitution scheme, involving more than three victims, some of which were prostituted simultaneously, was only possible through the concerted action of multiple people.  Defendant was one of these people.

It was not enough for the unemployed Defendant to merely profit from the violation of these young girls,  he also sadistically used the victims to satisfy his own deviant impulses.  Unlike the other MS-13 members and associates involved in this prostitution scheme, Defendant was constantly

having sexual intercourse with, or raping, the juvenile victims.  Many times the intercourse and sexual assaults took place in close proximity to the prostitution appointments that almost always involved multiple customers.   For example, as Jane Doe 1 testified at trial, Defendant "tested" her sexually prior to using her as a prostitute.  Defendant, specifically, forced Jane Doe 1 to perform oral sex on him without a condom, against her will, so she would "know what it felt like."  For Defendant, raping Jane Doe 1 was an extra benefit of being involved in a money-making prostitution scheme.  Tragically, Defendant also raped Jane Doe 3 during the course of the juvenile prostitution scheme.  Jane Doe 3 testified that she attempted to get away from Defendant on a particular occasion, but, despite her protests and physically struggling to get away, Defendant held her down and raped her.  These sexual assaults were part and parcel of the primary prostitution business as Defendant used these incidents to groom and maintain dominance over the victims.  Defendant, who apparently had a predilection for fourteen year old Jane Doe 2, had sexual intercourse with her almost nightly during Jane Doe 2's period of victimization as a prostitute.  Jane Doe 2 was the same juvenile female that Defendant struck in the face when she attempted to exert some independence while Defendant was prostituting her.  Defendant also encouraged his fellow gang members to have sex, free of charge, with any of the juvenile victims.  Defendant's providing of free sex with juvenile females made him popular in the gang and increased his standing in MS-13.

It is difficult to imagine more horrific circumstances surrounding a crime.  Defendant plied young girls with drugs and alcohol, raped them, and required these same young girls to endure sex with multiple, strange men night after night.  Physically and mentally ravaged from drugs, alcohol, and intercourse, the juvenile victims were then required to submit to sex with multiple gang members in what was referred to as a "trencito" or "train."

Given the hellacious nature and circumstances of this offense, and specifically the actions perpetrated by Defendant, a sentence of life imprisonment is not only appropriate, but completely just.

      **ii.    Life Imprisonment is Reasonable, Appropriate, Necessary, and Just Based Upon the History and Characteristics of Defendant**

Defendant is a violent, sexually-depraved danger to society. His adolescent and adult life has been characterized by immoral and illegal activity. His progression of deviant actions, which began with the brandishing of a knife against a child in his neighborhood, and culminated with his conviction for the sexual trafficking of multiple juveniles, started at age 13 and steadily increased in severity and depravity.

Defendant's previous convictions, which include multiple assaults, theft, gang participation, indecent exposure, and weapons offenses provide critical snapshots of Defendant's progression from a street criminal, to gang member, to federal sex trafficker of children. What is even more revealing about Defendant's character is how he responded each time he was apprehended and convicted. After Defendant committed grand larceny was placed in a supervised probation center, rather than attempt to make any type of positive change in his life, he was vindictive to his peers, antagonized and assaulted staff, and taught other inmates about MS-13. Defendant, as evidenced through his actions, preyed upon others and showed absolutely no respect for the rules. This precise behavior would manifest itself throughout the next 10 years of Defendant's life.

In 2005, Defendant, while trespassing at Edison High School, kicked and assaulted a student whom Defendant believed was a rival gang member. After the fight was broken up by staff members, Defendant yelled "MS-13 forever" and threw up gang signs. Just a month later, Defendant, along with other MS-13 members, attacked, with machetes, innocent attendees at a sweet-sixteen party. For

this crime, Defendant was certified as an adult and sent to jail. While in jail pending sentencing, Defendant instigated a fight at the detention center and caused a "near-riot." Further, during yet another term of incarceration, Defendant removed his penis from his pants and exposed himself to a teacher at the detention facility. Defendant, even after being convicted and removed from society, still managed to harm others and commit additional offenses.

In the case at bar, Defendant has revealed an even more flawed character. As stated in detail above, he raped, assaulted, and prostituted children; it is difficult to find a greater lack of morals than those of someone who harms children, let alone rapes and prostitutes them. In addition, Defendant has not revealed a scintilla of remorse for his actions or respect for the legal system. Following his initial appearance, he held up a solitary middle finger, in open court, at the FBI case agent. After the jury rendered its verdict, again in open court, Defendant threw up the gang signs of MS-13. During the trial itself, Defendant smugly smiled as witnesses, including the victims, struggled to discuss the harm they had suffered at the hands of Defendant.

Throughout his brief 23 years, Defendant has engaged in purely evil conduct and grievously harmed multiple people. Both Defendant's complete lack of morals and his extensive history as a criminal necessitate the imposition of a life sentence.

      **iii.** **Only a Sentence of Life Imprisonment Will Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Future Crimes of the Defendant**

As the evidence adduced over multiple days at trial showed, Defendant's prostitution of multiple girls is one of the most depraved offenses found in the United States Code. Defendant, through his direct actions, subjected the victims to unconscionable conditions. His conduct robbed the victims of their youth, endangered their mental and physical health, and has likely caused scars

that will last a lifetime. The only just punishment for his heinous crimes is life imprisonment. This becomes especially so when Defendant's lengthy criminal record and criminal history category VI are taken into account.

As this Court is aware, over the past year there has been a large increase in the number of juvenile sex trafficking prosecutions in the Eastern District of Virginia, many of which have been related to criminal street gangs. It is at this critical juncture that deterrence is most important. Gang members must not be permitted to see juvenile prostitution as a viable option for filling the gang's coffers. A sentence of life imprisonment, as clearly contemplated by the Guidelines, will send an unequivocal message to gang members, and others, that pervasive sex trafficking will cost you your freedom.

As stated in section B(ii) above, Defendant has been a danger to society for the last ten years. His criminal behavior has become increasingly more violent and harmful to others. As a criminal history category VI and an offense level 42, Defendant has reached the point where incapacitation through life imprisonment is the only way in which the public can be protected. He has been given a multitude of chances to live a law abiding life following previous transgressions. Defendant is not only a serial recidivist, but when incarcerated he has squandered opportunities at self improvement and instead engaged in further criminal conduct. As long as Defendant has been old enough to commit criminal acts, he has done so. The only way to protect the public from Defendant is through incapacitation. Based upon Defendant's history and characteristics as well as the seriousness of his multiple offenses, the term of incapacitation should be for life.

### iv. A Sentence of Life Imprisonment is Necessary to Avoid Sentencing Disparities Among Defendants with Similar Records who Are Guilty of Similar Conduct

Defendant's extensive criminal history, rape of multiple victims in the instant case, and lack of acceptance of responsibility require a sentence of life imprisonment to avoid sentencing disparities amongst Defendants with similar records who are guilty of similar conduct.

<u>Alonso Cornejo</u>

Prior to Amaya being charged, his coconspirator, Alonso Cornejo ("Cornejo"), pled guilty to the sex trafficking of four juvenile females. The Honorable Liam O'Grady, United States District Judge for the Eastern District of Virginia, sentenced Cornejo to 292 months of imprisonment. *See 1:11cr260, United States v. Alonso Cornejo.* Cornejo, however, had only one criminal history point, contrasted with Defendant's 15 criminal history points. This disparity cannot be overstated, Defendant is a life-long criminal, whereas Cornejo does not have a single adult conviction and, prior to his current charges, had never been in any type of detention. In addition, Cornejo had an adjusted offense level of 40, two points lower than that of Defendant. The Guidelines appropriately took Cornejo's lack of criminal history and acceptance of responsibility into account in establishing his range of 292 - 365 months of imprisonment versus Defendant's Guideline's range of 360 months to life imprisonment. Further, there is no evidence that Cornejo raped or routinely had sexual intercourse with the prostitution victims, in contrast to the Defendant who raped multiple victims on multiple occasions. Finally, Cornejo accepted responsibility for the terrible crimes he committed, which had the effect of sparing the victims the pain of testifying. Cornejo and Defendant were part of the same prostitution scheme, but it was their actions, both prior to being charged with this offense, during the offense, and once charged, which distinguishes the sentences that each should receive pursuant to the §3553(a) factors.

12

Jose Juarez Santamaria

Jose Juarez Santamaria ("Santamaria"), following a jury trial, was convicted in this Court on July 28, 2011. *See 1:11cr217, United States v. Juarez Santamaria.* Santamaria was convicted of conspiracy to transport a minor to engage in prostitution, transportation of a minor to engage in prostitution, and, like in the present case, sex trafficking of a child. The Honorable Liam O'Grady sentenced Santamaria to life in prison. Santamaria possessed a criminal history category II, four categories lower than the Defendant. Santamaria, who is the same age as Defendant, had only two previous convictions compared to Defendant's twelve. Santamaria's offense conduct resulted in an offense level of 43; only one point higher than that of Defendant. Despite having prostituted two fewer juveniles than Defendant, Santamaria's guidelines were a point higher because he prostituted a juvenile who was under the age of fourteen and received an enhancement for obstruction of justice. Despite this one point difference, Defendant is equally, if not more, culpable than Santmaria given that Defendant has an atrocious criminal history and trafficked three juveniles to Santamaria's one. Like Santamaria, Defendant, through his depraved conduct, has earned a sentence of life imprisonment and a sentence of less than life imprisonment would result in disparate sentences amongst similarly-situated defendants.

### III.   Conclusion

As the foregoing, along with the evidence adduced at trial, establishes, Defendant's depraved acts represent some of the most despicable conduct imaginable: the sexual violation of minors for pleasure, profit, and advancement in MS-13. Life sentences are reserved for the most heinous of crimes and the most violent of offenders; Defendant meets both of these criteria. The Guidelines contemplate, the facts demand, and justice requires that Defendant receive a sentence of life imprisonment.

Respectfully Submitted,

Neil H. MacBride
United States Attorney


By:         /s/
      Zachary Terwilliger
      Assistant United States Attorney
      Michael J. Frank
      Special Assistant United States Attorney
      Attorneys for the United States
      United States Attorney's Office
      2100 Jamieson Avenue
      Alexandria, Virginia 22314
      Tel: (703) 299-3700
      Fax: (703) 299-3982

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on Friday, May 25, 2012, I filed the foregoing pleading with the Clerk of the Court, which through the CM/ECF system automatically provided a copy to:

Michael Arif, Esq.
Counsel for defendant Rances Ulices Amaya.

By:     /s/
    Zachary Terwilliger
    Assistant United States Attorney
    Attorney for the United States
    United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, Virginia 22314
    Tel: (703) 299-3700
    Fax: (703) 299-3982